TINGEY (ORMSBY v.). See Case No. 10,-580.

## Case No. 14,057.

### TINGLE v. TUCKER.

[1 Abb. Adm. 519.][1]

District Court, S D. New York.   April, 1849.

SEAMEN — WAGES — DISCHARGE BY CONSUL — CONTINUING CLAIM FOR WAGES — DECEIT — COLLUSION.

1. Where a master procures a seaman to be discharged by a United States consul in a foreign port, if any deceit or collusion has been practised by the master in obtaining the discharge, he can claim no benefit or immunity under it

2. When there is no evidence of improper conduct on the part of the master in obtaining a seaman's discharge by a consul, and it appears that the consul has proceeded fairly, and on clear prima facie proofs has ordered the seaman to be discharged for criminal conduct, such discharge itself is a bar to any continuing claim for wages which might be enforced if the seaman's connection with the vessel still subsisted.
[Cited in Coffin v. Weld, Case No. 2,953; The Paul Revere. 10 Fed. 158.]

3. The propriety of the consul's interference is to be determined upon the facts before him, and not by the case which may be afterwards shown upon a trial.

This was a libel in personam by Abraham Tingle against Joseph I. Tucker, master of the ship Diadem, to recover wages. Four other suits were brought by other members of the crew of the Diadem, upon the same state of facts, and involving the same questions. The five suits were consolidated and heard as one. The five libellants were all colored men. The libels showed that the ship was up in January, 1848, for a voyage from New York to Apalachicola, thence to one or more ports in Europe, and back to a port of discharge in the United States. Some of the libellants sailed with the vessel from New York to Apalachicola, and all of them performed the voyage from Apalachicola to Marseilles. The libellants charged that they were ill treated on the voyage, both as to provisions and as to time and manner of work, and that on the arrival of the ship at Marseilles, they were, by order of the defendant, thrown into prison, and there detained until the ship sailed; and that they were then left by her

1 [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

at that place, although willing and desirous to continue on board and to perform the voyage. The libellants averred their own good conduct during the voyage, and claimed full wages to the time of the arrival of the ship at the port of New York, together with their expenses incurred in Marseilles, and in returning home; the aggregate amount of their claims being $702. The answers denied any improper conduct on the part of the respondent towards the libellants, and alleged that the libellants had been fully paid all their earnings by advances made to them, and by expenses and disbursements which the respondent incurred by reason of the misconduct of the libellants on board the ship. The answer then alleged that on the passage to Marseilles, the libellants were guilty of disorderly conduct, amounting to open mutiny and revolt, and which was carried to the extreme of depriving the officers of the command and control of the crew, and putting them in fear for their lives; that on the arrival of the ship at Marseilles, the conduct of the crew was reported to the United States consul at that port, who, after taking the depositions of the officers and steward, and inquiring into the facts, ordered the libellants to be discharged from the ship, and sent to the United States for trial; that in so doing, the consul acted on his own judgment and authority, though, as respondent believed, his own life and the ship would have been unsafe, if the libellants had remained on board. The respondent further averred, that he had no knowledge that the libellants were imprisoned at Marseilles. On the hearing, numerous and very contradictory proofs were put in, relating to the conduct of the libellants complained of by the respondent. It did not appear, however, upon the whole, that the libellants were guilty of any extreme misconduct, or that the officers had any reasonable cause for apprehending personal danger or any intentional mutiny. It was further shown, that on the arrival of the libellants in New Orleans for trial, the proofs which were offered to the grand jury there were regarded by them as insufficient foundation for indictment. It was, however, clear, that the conduct of libellants was at times perverse and offensive to the officers, and that they were deficient in ready subordination and alacrity in the performance of their duties.

The respondent relied upon the discharge granted by the United States consul as being conclusive on the question relative to the conduct of the libellants. The certificate of discharge was as follows:—"Consulate of the United States, Marseilles. I, D. C. Croxall, consul of the United States at Marseilles, certify that Captain Joseph I. Tucker, master of the ship Diadem, of New York, personally came and appeared before me, at my office in the city of Marseilles, on the 19th day of May, A. D. 1848, and after depositing his ship's papers, declared that he had a charge to enter before me against several of the

crew of the said ship, and proceeded to charge Joseph Tilman, Abraham Tingle, Henry Tingle, Joshua Boston, and David Martin, colored seamen, with having committed divers acts of premeditated violence, disobedience, abuse, and direct personal obstruction of the execution of his lawful orders on board said ship during her voyage from New York to Apalachicola, and from thence to Marseilles. That said five seamen exercised great influence over others (colored) of the crew, and caused them to join in all their bad and mutinous conduct. That his (the said captain's) life had been threatened by one if not more of said seamen, and that neither he nor his officers had any control or command over them or the men under their influence. That he, and his first officer, did not consider it proper or safe that said five men, the ringleaders, should be retained on board. That they, the said master and mate, should be afraid and unwilling to proceed again to sea with them, and therefore requested me, the said consul, to take steps to have said ringleaders removed from said ship and imprisoned, not deeming his (the said master's) person or life safe from them, and that he should produce proofs preparatory to the discharge of said seamen from said ship. I certify that after examining said master, the first officer, the cook, E. Cooper, and a seaman named Lewis, (George,) and also Mrs. Caroline Tucker, wife of the said captain, separately under oath, and finding the said master's statement confirmed by the other witnesses, I accordingly discharged said five seamen named herein, as the ringleaders in the various acts of mutiny, disobedience, abuse and revolt charged against them, from said ship, and shipped other seamen in their stead. Witness my hand and official seal, at Marseilles, this 3d day of June, 1848. (Signed,) D. C. Croxall, United States Consul. (L. S.)"

Alanson Nash, for libellants.

E. C. Benedict, for respondent.

I. The rule of law is clear that the captain has the right in cases of incorrigible disobedience, mutinous and rebellious conduct, to discharge a seaman before the end of the voyage. Turner's Case [Case No. 14,248]. The law clothes him with that discretion.

II. Consuls, too, have very large discretion in such matters, even by statute. It is a mistake, however, to consider the functions and powers of consuls as mere creatures of the statutes of the United States. Consuls have certain duties given to them by statute, but they are international ministers deriving most of their powers from the law of nations and international usages, and in all nations have always had a very extensive and beneficial jurisdiction, as well in advice as in action in all this class of cases. It is the duty of a master in all such cases to address himself to the consul of his nation for advice and aid, and doing so, the law will protect him when he acts in good faith.

III. In this case, every thing shows that the captain and the consul acted deliberately and honestly in the exercise of an official discretion. That discretion was conferred upon them by the law, and it is a principle to which there is no exception, that when the law confers discretion, it protects the exercise of that discretion. If it be exercised in good faith, the act is binding, and the party that exercises it is subject to no consequences. If the innocent suffer, it is their misfortune; if the guilty escape punishment it is their good luck.

IV. The men were lawfully discharged; their voyage was legally ended and their wages stopped. They were legally sent home by the consul to be tried. That they were never tried was their good fortune, but it has no effect upon the conduct of the captain or the consul.

BETTS, District Judge. The sufficiency of the action taken by the United States consul at Marseilles to exonerate the respondent from liability for the improper imprisonment of the libellants and for their discharge from the ship, is the main point to be considered and disposed of.

The proceedings before the consul were had at the instance of the respondent; and if any deceit or malpractice had been resorted to by him to induce the official act of the consul, he could not claim any immunity or benefit under that act. There is nothing in the case, however, to show improper conduct or blamable motives on the part of the master in referring the subject to the consul, or that he did not act in the belief that the libellants had committed offences against the laws of the United States, and that the consul had rightful authority to examine into and adjudicate upon the charges, and take order thereon against the seamen.

The consul certifies and returns in full the proofs taken by him, and states his proceedings to have been had by virtue of section 5 of article 35 of the consular instructions relative to seamen of the United States.

The instructions referred to are not before the court, but they probably have relation to the duties of consuls under the acts of 1803 and 1840.

Section 1 of the act of February 28, 1803 (2 Stat. 203), implies the power of a consul to discharge a seaman in a foreign port, and to give a certificate of such act on his part; as by the provisions of the section such certificate of the consular consent to the discharge relieves the master from the penalty imposed for not bringing back to the United States such seaman with the ship.

The act of July 20, 1840, in terms requires the concurrence of the seaman and master in an application to the consul in order to authorize him to discharge the seaman in a foreign port under the provisions of subdivisions 5 and 6 of section 1 of that act. 5 Stat. 395. The discharge contemplated by

those sections is, however, manifestly one from the obligation of the shipping contract, and has no connection with the authority of consuls in repressing criminal offences committed by seamen, or in bringing them to punishment therefor.

Subdivision 11 of section 1 of the same act (Act July 20, 1840; 5 Stat. 395) declares, "it shall be the duty of consuls and commercial agents to reclaim deserters, and discountenance insubordination by every means in their power, and when the local authorities can be usefully employed for that purpose, to lend their aid, and use their exertions to that end in the most effectual manner."

It is known to be the familiar practice, in French ports especially, for consuls, upon the representations of masters of vessels, and on a proper substantiation of facts, to obtain the interposition of the local police, which of its own authority commits seamen to prison because of offences on board of their vessels, or for insubordination of conduct. Cases of this nature have for many years been of frequent occurrence.

It is also a common exercise of authority by American consuls in foreign ports, to send home for trial, in their own ships, or by a different conveyance, seamen accused of crimes committed at sea or in foreign ports. I am not aware that the obligation of ship-masters to bring home such prisoners, or the authority of consuls to transmit them, has ever been directly questioned. Some of our most distinguished admiralty judges have expressed strong doubts as to the power of consuls in these respects; and also, whether, in case seamen are imprisoned abroad or sent home compulsorily by them, such acts exonerate the master from liability to the men for full wages and damages.

Those cases will be more particularly adverted to in another view of this subject. The question now raised in this cause, it is to be remarked, was not directly presented in those for decision; and the suggestions of the courts, as to the authority of those acts, were accordingly incidental, and in illustration of the general doctrines of the law.

The inquiry in the present case is, whether the consul, upon the facts asserted by him, could lawfully discharge the libellants from the ship, and authorize the master to make up his crew by employing others in their place.

The testimony taken before the consul proves that the conduct and threats of the libellants on board of the vessel were highly mutinous, and that the officers had reasonable grounds for fear for their lives, and had no power to control or restrain the men, at sea.

The testimony of the captain and his wife, taken by the consul, could not be admitted on the trial of the respondent in court, the suit being personally against him for wages.

The testimony, also, given by Cooper and Lewis, two of the crew, before the consul, was retracted, or changed in essential features on their examination in this court. Two other persons on board, who were not witnesses before the consul, were examined in court, as were also the libellants each for the others. These proofs rendered the balance of evidence plainly in favor of the libellants against the charge that their acts had been dangerous to the safety of the vessel or her officers. This result of the trial here, does not, however, authorize the conclusion that the case before the consul did not warrant his proceedings, nor but that the hearing in this court, had it been on an indictment before a jury, where the testimony of the master of the vessel and his wife would have been competent, might have led to the conviction of the seamen of the mutinous conduct charged against them. The point, then, is whether the consular act, upon the proofs before him, in detaching these men from the ship, and ordering them home, to be there dealt with under the laws of the United States, on charges for criminal offences committed at sea, fails to bar their right to demand wages to the end of the voyage, because the evidence before the courts on full hearing disproves the necessity or propriety of the consular order. It is to be observed that the decision of the consul is not given merely at the instance and on the representation of the master and respondent. He examined into the charges officially, and decided the course he would adopt upon full hearing of proofs.

Judges Hopkinson and Ware strongly intimate that the act of a consul in confining or discharging a seaman for criminal misconduct abroad, affords no protection to the master on a demand by the seaman for wages and expenses and damages accruing by his discharge or imprisonment. Wilson v. The Mary [Case No. 17,823]; The William Harris [Id. 17,695].

The force of these suggestions may, perhaps, be regarded as modified by the views expressed by Judge Ware in the more recent case of Smith v. Treat [Id. 13,117]. This was a suit brought by the libellant, a seaman on board of the Nimrod, against the master of the vessel, for the recovery of wages. It seems that, by reason of the criminal conduct of the libellant at sea, he was arrested, upon the arrival of the vessel at Point Peter, in the West Indies, and confined in prison, no other civil authority being invoked than that of the American consul at that place. He was subsequently, by order of the consul, sent home in irons to answer to the charges brought against him abroad for such offences.

In relation to that case, the Judge says: "As it was, it was certainly the duty of the master to call upon the civil authority of the place, and put the affair in a train of judicial examination. The result of that inquiry

was, that Smith was sent home as a prisoner to answer for his conduct to the laws of his country. And from the facts developed on the trial here, it appears to me, that the civil authorities were perfectly justified in this course." Smith v. Treat [supra].

Although it is not conceded in this decision, that the consul's discharge of the seaman abroad, and issuing a certificate of such discharge, because of his criminal conduct, would bar to the man the recovery of his wages here, yet wages were in fact denied him, because, by his own misconduct, he had disqualified himself from performing the services for which wages were to be paid.

My mind is better satisfied with the more direct and practical principle applicable to the facts. The rightful authority and duty of the consul to interfere and take a seaman from his ship, when his continuance there is dangerous to officers or men, being recognized,—The Nimrod [Case No. 10,267]; Smith v. Treat [Id. 13,117],—I think it results that such practical discharge terminates the connection of the seaman with the ship, and disqualifies him from suing the master or ship for after wages of the voyage, and it is quite immaterial whether the judgment of discharge rendered by the consul in this instance, constitutes a bar to the action, if his act legally separated them from the ship and her service.

This of course presupposes that there has been no improper collusion or deceit on the part of the master or owners, and that the consul has proceeded with integrity and on probable cause in his doings. The consul is personally liable to the party injured, if guilty of any abuse of power, for all damages occasioned thereby. Act 1840, art. 18 (5 Stat. 397). I apprehend, however, that the sounder and safer doctrine is, that when on clear primâ facie proofs he orders a seaman to be discharged from a vessel for criminal conduct threatening the safety of the vessel, or of her officers or company, and transmits him home for trial on the accusations, such discharge is a bar to any continuing claim for wages, that might be enforced if his connection with the vessel still rightfully subsisted.

The propriety of the consul's interference is to be determined upon the facts before him at the time, and not by the case which may be shown afterwards on trial. As in the present instance, displacing part of the testimony legitimately admitted by the consul, and introducing other not heard by him, may give the case a new aspect, and show that the seamen, though debarred of wages eo nomine by the act of the consul, may yet resort to the master for damages because of their improper severance from the ship.

Although the evidence before me is irreconcilably conflicting on many points, I consider the preponderance of it to support the demand of the libellants for wages up to the time of their discharge, and that no forfei-

ture or bar of those wages is established by the respondent.

The expenses incurred by them in Marseilles, by imprisonment or otherwise, were not caused by the master. His application to the consul was that the men should be discharged or taken from the vessel. That was granted. Then the consul, following his own judgment of his duty in furtherance of public justice, had the men committed to prison, and afterwards sent home, as prisoners for trial.

The testimony does not fix upon the defendant any responsibility for these acts, which can be enforced in this form of action.

The decree will be, that the libellants, in these respective causes, recover their several wages up to the time of their discharge at Marseilles, with costs to be taxed; and that the demand for wages to the termination of the home voyage be denied. Order accordingly.